**ALBERTO–CULVER CO., a Delaware Corporation,**

v.

**TREVIVE, INC., a California Corporation, Defendant.**

**No. CV 01–5336–RC.**

United States District Court, C.D. California.

May 7, 2002.

Charles R. Mandly, Wildman, Harrold, Allen & Dixon, Chicago, IL, for plaintiff.

Dennis G. Martin, Willmore F. Holbrow, Blakely, Sokoloff, Taylor & Zafman, Los Angeles, CA, for defendant.

## MEMORANDUM DECISION AND ORDER

CHAPMAN, United States Magistrate Judge.

On January 22, 2002, plaintiff Alberto–Culver Co. filed a notice of motion and motion for summary judgment,[1] with supporting memorandum of points and authorities and declaration of Nathan E. Ferguson (with exhibits), a statement of uncontroverted facts and conclusions of laws, and a proposed order. Plaintiff claims that as a result of prior litigation

---

1. Plaintiff's motion is, in fact, a motion for partial summary judgment since it does not address all of plaintiff's claims.

between the parties before the Trademark Trial and Appeal Board ("Board") of the Patent and Trademark Office ("PTO"), *see Alberto–Culver Co. v. Han Beauty, Inc.,* 1999 WL 1004627 (Trademark Tr. & App. Bd.), and Federal Circuit Court of Appeals, *Han Beauty, Inc., v. Alberto–Culver Co.,* 236 F.3d 1333 (Fed.Cir.2001), defendant Trevive, Inc., should be collaterally estopped from relitigating the issues of plaintiff's ownership of its TRES-family of marks for hair care products and whether defendant's use of its TREVIVE trade name for hair care products results in a likelihood of confusion in violation of plaintiff's rights. The plaintiff, therefore, requests this Court enter partial summary judgment in its favor, and permanently enjoin defendant from using the TREVIVE mark.

On March 6, 2002, defendant filed its memorandum of points and authorities in opposition to plaintiff's summary judgment motion, a statement of genuine issues of material fact in opposition to plaintiff's motion, the supporting declarations of Willmore F. Holbrow, Steve Han, Mary Goodstein and Dr. Itamar Simonson,[2] and an appendix of exhibits. Defendant contends that collateral estoppel does not apply to this action.

On March 20, 2002, plaintiff filed a reply memorandum, with the supporting declaration of Mike Yaghmai.

Oral argument was held on April 22, 2002, before Magistrate Judge Rosalyn M. Chapman. Charles R. Mandly, attorney-at-law, appeared on behalf of plaintiff, and Dennis G. Martin and William F. Holbrow, attorneys-at-law, appeared on behalf of defendant.

## BACKGROUND

### I

On June 15, 2001, plaintiff Alberto–Culver Co., a Delaware corporation, filed a complaint against Trevive, Inc., a California corporation, setting forth five causes of action: (1) trademark infringement, in violation of 15 U.S.C. § 1114; (2) false designation of origin, in violation of 15 U.S.C. § 1125(a); (3) unfair competition and dilution, in violation of 15 U.S.C. § 1125(c); (4) trademark dilution, in violation of California Business & Professions Code ("Cal. Bus. & Prof. C.") §§ 14330, et seq.; and (5) unfair competition and deceptive trade practices, in violation of Cal. Bus. & Prof. C. §§ 17200, et seq.[3] Plaintiff seeks injunctive relief, an accounting, compensatory damages, punitive damages, treble damages, attorney's fees and costs. The gravamen of plaintiff's complaint is that defendant markets and sells hair care products under the trade name TREVIVE, with the knowledge of plaintiff's registered TRES-family of marks for hair care products and without the consent or

---

**2.** Defendant offers no explanation why the Goodstein declaration was not prepared for, and presented to, the Board.

**3.** Although plaintiff does not discuss the extent to which its motion for partial summary judgment based on collateral estoppel applies to each of its five claims, the Court has determined that the motion applies to the first, second and fifth claims. Likelihood of confusion is irrelevant to trademark dilution claims under 15 U.S.C. § 1125(c) and Cal. Bus. & Prof. C. §§ 14330, et seq., *Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 875 (9th

Cir.1999); *Teletech Customer Care Mgt. (Cal.), Inc. v. Tele–Tech Co., Inc.,* 977 F.Supp. 1407, 1412 (C.D.Cal.1997); on the other hand, "[a]n action for unfair competition under Cal. Bus. & Prof. C. §§ 17200, et seq., is 'substantially congruent' to a trademark infringement claim under the Lanham Act [15 U.S.C. §§ 1114 and 1125(a)]." *Enesco Corp. v. Price/Costco, Inc.,* 146 F.3d 1083, 1084 n. 1 (9th Cir.1998); *Cleary v. News Corp.,* 30 F.3d 1255, 1262–63 (9th Cir.1994); *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1457 (9th Cir.1991).

authorization of plaintiff. The defendant answered the complaint on August 8, 2001, and raised five affirmative defenses.

## II

On May 3, 1994, Han Beauty, Inc., filed an application (serial no. 74/519,598) with the PTO to register a trademark for "TREVIVE NUTRIENTS FOR LIFE OF YOUR HAIR." *Alberto–Culver Co.*, 1999 WL 1004627 at *1 n. 1. The registration was subsequently assigned to the defendant, Trevive, Inc. *Id.; see also* Ferguson Decl., Exh. 1 at 141–42. On October 10, 1995, plaintiff filed a Notice of Opposition to the trademark registration under 15 U.S.C. § 1052(d), arguing that "[u]se by applicant of the mark TREVIVE and Design for hair shampoo, hair conditioning, hair gel, and hair spray is likely to cause confusion, mistake, or deception with each of opposer's TRES-trademarks or in the belief that applicant or its TREVIVE and Design products are in some way legitimately connected with, or licensed or approved by, opposer." Ferguson Decl., Exh. 1 at 13–15.

The parties then conducted discovery and presented evidence to the Board, which, on November 10, 1999, sustained plaintiff's opposition and denied registration of the disputed trademark. *Alberto–Culver Co.*, 1999 WL 1004627 at *1–4. The defendant appealed the Board's decision to the Federal Circuit Court of Appeals, which affirmed the Board's decision. *Han Beauty, Inc.*, 236 F.3d at 1334–38.

## DISCUSSION

### III

Federal Rule of Civil Procedure 56(c) authorizes the granting of summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of identifying the elements of the claim in the pleadings, or other evidence which the moving party "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *McClure v. Life Ins. Co. of North America,* 84 F.3d 1129, 1132–33 (9th Cir.1996) (per curiam). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982). The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553; *Gasaway v. Northwestern Mutual Life Ins. Co.,* 26 F.3d 957, 959–60 (9th Cir.1994).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 1551–52, 143 L.Ed.2d 731 (1999) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)); *Diruzza v. County of Tehama,* 206 F.3d 1304, 1314 (9th Cir.), *cert. denied,* 531 U.S. 1035, 121 S.Ct. 624, 148 L.Ed.2d 533 (2000). However, more than a "metaphysical doubt" is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Scribner v. Worldcom, Inc.,* 249 F.3d 902, 907 (9th Cir.2001). Rather, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted); *Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir.2001) (en banc). In an appropriate

trademark infringement case, likelihood of confusion may be determined as a matter of law. *Murray v. Cable Nat'l Broad. Co.,* 86 F.3d 858, 860–61 (9th Cir.1996), *cert. denied,* 519 U.S. 1058, 117 S.Ct. 689, 136 L.Ed.2d 613 (1997).

## IV

Under collateral estoppel or issue preclusion, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980); *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979).[4] "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana,* 440 U.S. at 153–54, 99 S.Ct. at 973–74; *Disimone v. Browner,* 121 F.3d 1262, 1267 (9th Cir.1997).

Here, plaintiff seeks to apply "offensive" collateral estoppel, which "occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party." *United States v. Mendoza,* 464 U.S. 154, 159 n. 4, 104 S.Ct. 568, 571 n. 4, 78 L.Ed.2d 379 (1984); *National Med. Enter., Inc. v. Sullivan,* 916 F.2d 542, 545 n. 2 (9th Cir.1990), *cert. denied,* 500 U.S.

917, 111 S.Ct. 2014, 114 L.Ed.2d 100 (1991).

 Collateral estoppel bars a party from relitigating an issue if the issue at stake is identical to the one alleged in the prior litigation, the issue was actually litigated in the prior litigation, and the determination of the issue in the prior litigation was a critical and necessary part of the judgment in the earlier action. *Disimone,* 121 F.3d at 1267; *Figueroa v. Campbell Indus.,* 45 F.3d 311, 315 (9th Cir.1995); *Clark v. Bear Stearns & Co.,* 966 F.2d 1318, 1320–21 (9th Cir.1992).

### 1. Identical Issues:

 "The party asserting collateral estoppel must first show that the estopped issue is identical to an issue litigated in a previous action." *Kamilche Co. v. United States,* 53 F.3d 1059, 1062 (9th Cir.1995), *as amended,* 75 F.3d 1391 (1996); *Pool Water Products v. Olin Corp.,* 258 F.3d 1024, 1031 (9th Cir.2001); *see also Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1357 (9th Cir.1985) (en banc) ("Similarity between issues does not suffice: collateral estoppel is applied only when the issues are identical."). The Court must consider four factors to determine whether an issue in a proceeding is identical to an issue previously litigated:

(1) is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?

(2) does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding?

(3) could pretrial preparation and discovery related to the matter presented in the first action reasonably be expect-

---

4. Collateral estoppel may also apply to the final decision of an administrative agency acting in a judicial capacity. *Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 107,

111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991); *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966).

ed to have embraced the matter sought to be presented in the second? [and] (4) how closely related are the claims involved in the two proceedings?

*Resolution Trust Corp. v. Keating,* 186 F.3d 1110, 1116 (9th Cir.1999); *Disimone,* 121 F.3d at 1267; *Steen v. John Hancock Mut. Life Ins. Co.,* 106 F.3d 904, 912 (9th Cir.1997).

The PTO may refuse to register a trademark that so resembles a registered mark "as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d).[5] In actions opposing registration under Section 1052(d), the Board considers the following factors:

> (1) the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression; (2) the similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use; (3) the similarity or dissimilarity of established, likely-to-continue trade channels; (4) the conditions under which and buyers to whom sales are made, i.e., "impulse" vs. careful, sophisticated purchasing; (5) the fame of the prior mark (sales, advertising, length of use); (6) the number and nature of similar marks in use on similar goods; (7) the nature and extent of any actual confusion; (8) the length of time

during and conditions under which there has been concurrent use without evidence of actual confusion; (9) the variety of goods on which a mark is or is not used (house mark, "family" mark, product mark); (10) the market interface between applicant and the owner of a prior mark; (11) the extent to which applicant has a right to exclude others from use of its mark on its goods; (12) the extent of potential confusion, i.e., whether de minimis or substantial; and (13) any other established fact probative of the effect of use.

*Recot, Inc. v. M.C. Becton,* 214 F.3d 1322, 1326–27 (Fed.Cir.2000); *Application of E.I. DuPont DeNemours & Co.,* 476 F.2d 1357, 1361 (C.C.P.A.1973). "The likelihood of confusion analysis considers all ... factors for which there is evidence in the record but 'may focus ... on dispositive factors, such as similarity of the marks and relatedness of the goods.'" *Hewlett–Packard Co. v. Packard Press, Inc.,* 281 F.3d 1261, 1265 (Fed.Cir.2002) (quoting *Han Beauty, Inc.,* 236 F.3d at 1336). "Whether a likelihood of confusion exists is a question of law, based on underlying factual determinations." *Recot, Inc.,* 214 F.3d at 1326; *Han Beauty, Inc.,* 236 F.3d at 1336.

Similarly, likelihood of confusion is also the central element of a trademark infringement claim under 15 U.S.C. § 1114(1)[6] or § 1125(a)(1).[7] *GoTo.Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199,

---

**5.** 15 U.S.C. § 1052 provides, in pertinent part,

> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it
>
> \* \* \* \* \* \*
>
> (d) Consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United

States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive[.]

15 U.S.C. § 1052(d).

**6.** 15 U.S.C. § 1114(1) provides, in pertinent part:

> Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation

1205 (9th Cir.2000); *Brookfield Communications, Inc. v. West Coast Entm't Co.*, 174 F.3d 1036, 1053 (9th Cir.1999). In a trademark infringement case, the Ninth Circuit:

> looks to the following [eight] factors for guidance in determining the likelihood of confusion: similarity of the conflicting designations; relatedness or proximity of the two companies' products or services; strength of [plaintiff's] mark; marketing channels used; degree of care likely to be exercised by purchasers in selecting goods; [defendant's] intent in selecting its mark; evidence of actual confusion; and likelihood of expansion in product lines.

*Brookfield*, 174 F.3d at 1053–54; *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir.2002).[8] "[T]he eight-factor test for likelihood of confusion is pliant[,] . . . [and not] exhaustive, and non-listed variables may often be quite important." *Brookfield*, 174 F.3d at 1054.

Here, as set forth in greater detail in Part V below, this Court finds that the

Board and Federal Circuit in determining the issue of likelihood of confusion considered the same factors as would be considered by this Court under the Sleekcraft test for determining the issue of likelihood of confusion in this trademark infringement action. Thus, the first factor in determining collateral estoppel, the identical nature of the issue at stake, has been met.

### 2. Issue Was Actually Litigated in Prior Proceeding:

"In determining whether an issue was 'actually litigated and determined' in an earlier adjudication, the court is 'allowed to draw necessary inferences from the prior adjudication in order to determine whether an issue was actually decided.'" *Disimone*, 121 F.3d at 1268 (quoting *Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply, Inc.*, 106 F.3d 894, 901 (9th Cir.), *cert. denied*, 522 U.S. 857, 118 S.Ct. 155, 139 L.Ed.2d 101 (1997)). Here, there is no real question that the

---

of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

**7.** 15 U.S.C. § 1125(a)(1) provides, in pertinent part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term,

name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

**8.** "These eight factors are often referred to as the *Sleekcraft* factors." *Brookfield*, 174 F.3d at 1054 (italics in original); *see AMF Inc., v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979).

issue of "likelihood of confusion" was actually litigated in the opposition proceeding before the Board. The Board specifically held that defendant's "mark, when considered in its entirety, is sufficiently similar to [plaintiff's] family of Tres-prefix marks ... that ... confusion is likely to occur in the marketplace[,]" *Alberto–Culver Co.*, 1999 WL 1004627 at *4, and the Federal Circuit specifically "affirm[ed] the holding that confusion is likely between [defendant's] TREVIVE NUTRIENTS FOR THE LIFE OF YOUR HAIR and design mark and Alberto–Culver's TRES-family of marks...." *Han Beauty, Inc.*, 236 F.3d at 1338.

### 3. Issue Was Critical Part of Prior Judgment:

"Preclusive force attaches only to issues that were necessary to support the judgment in the prior action." *Pool Water Prods.*, 258 F.3d at 1031; *Resolution Trust Corp.*, 186 F.3d at 1115. "Litigants are conversely not precluded from relitigating an issue if its determination was merely incidental to the judgment in [the] prior action." *Resolution Trust Corp.*, 186 F.3d at 1115; *Pool Water Prods.*, 258 F.3d at 1031. Here, there is no real question that the finding of likelihood of confusion was a critical and necessary part of both the Board's decision to refuse to register defendant's mark, and the Federal Circuit's subsequent decision to affirm the Board. Indeed, the Board and Federal Circuit's determination that there was a likelihood of confusion between defendant's mark and plaintiff's TRES-family of marks was the critical reason the Board denied the registration of defendant's mark and the Federal Circuit affirmed the Board's decision. 15 U.S.C. § 1052(d); *see also CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 674 (7th Cir.2001) ("Likelihood of confusion is ... the central ... issue in reviewing a decision by the [Board] to sustain or dismiss opposition to a trademark registration.").

### V

The Ninth Circuit has never specifically addressed what collateral estoppel effect, if any, a Board or Federal Circuit decision regarding likelihood of confusion has in a subsequent trademark infringement lawsuit. Where, as here, the Federal Circuit has affirmed the Board's finding of likelihood of confusion, this Court properly assesses the collateral estoppel effect of the Federal Circuit's opinion, since likelihood of confusion is an issue of law in an opposition proceeding. *Recot, Inc.*, 214 F.3d at 1326; *Han Beauty, Inc.*, 236 F.3d at 1336.[9]

**9.** However, Professor J. Thomas McCarthy, a leading commentator on the subject of trademarks, does not expressly distinguish between Board decisions appealed to the Federal Circuit and those not appealed. Rather, he groups decisions discussing the collateral estoppel effect of inter partes PTO decisions into three "views": (1) The "minority" view of the Seventh and Eighth Circuits, which "treat Trademark Board decisions as administrative judgments which carry full preclusive effect as to adjudicated facts, at least if they are appealed to the Federal Circuit"; (2) the "majority" view, in which courts, "for a variety of reasons, will not give preclusive effect, but may give some weight, to Trademark Board inter partes decisions," as set forth in, e.g., *Irving–Cloud Pub. Co. v. Chilton Co.*, 463 F.Supp. 476, 479 (E.D.Pa.1978) and *Mayo Found. v. Doxsee Food Corp.*, 183 U.S.P.Q. 355, 357 (D.Minn.1974); and (3) the "intermediate" view of the Fifth and Eleventh Circuits, as set forth in *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1180–81 (11th Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985) and *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 10 (5th Cir.1974), which hold that "neither claim nor issue preclusion apply from an inter partes decision of the Trademark Board, but that the findings of the Board 'will control' in collateral litigation 'unless the contrary is established by evidence that, in character and amount, carries thorough conviction.'" 5 J. Thomas McCarthy,

Every circuit court to consider this issue has determined that the court can, in appropriate circumstances, afford collateral estoppel effect to a determination of likelihood of confusion by the Federal Circuit or its predecessor, the Court of Customs and Patent Appeals ("C.C.P.A."). *See Levy v. Kosher Overseers Ass'n of America, Inc.,* 104 F.3d 38, 42 (2d Cir.1997) ("For a ... Federal Circuit determination of 'likelihood of confusion' to have collateral estoppel effect in a trademark infringement action, the ... Federal Circuit must have taken into account, in a meaningful way, the *context* of the marketplace." (emphasis in original)); *Jim Beam Brands Co. v. Beamish & Crawford, Ltd.,* 937 F.2d 729, 734–35 (2d Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992) (declining to apply collateral estoppel to Federal Circuit decision under facts presented but suggesting that, had the Federal Circuit considered the disputed marks in context of their use rather than abstractly, collateral estoppel would have been appropriate); *EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.,* 746 F.2d 375, 377–79 (7th Cir.1984) (applying collateral estoppel to Federal Circuit decision affirming Board's rejection of plaintiff's opposition to registration application); *Flavor Corp. of America v. Kemin Indus., Inc.,* 493 F.2d 275, 279–81 (8th Cir.1974) ("[W]here the [C.C.P.A.] has found a likelihood of confusion between two similar marks in a cancellation proceeding, that fact is precluded from relitigation in a subsequent infringement action between the same parties under the doctrine of collateral estoppel.").[10]

In determining whether to apply collateral estoppel, Professor McCarthy advises:

[A]n inter partes decision of the Trademark Board, whether reviewed by the Federal Circuit or not, must be carefully examined to determine exactly what was decided and on what evidentiary basis.... [W]here the Trademark Board has indeed compared conflicting marks in their entire marketplace context, the factual basis for the likelihood of confusion issue is the same, the issues are the same, and collateral estoppel is appropriate.

5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 32:101 (4th ed.2001). Moreover, the Second Circuit has recently expressly adopted Professor McCarthy's view, concluding that "[f]or a [Board] or Federal Circuit determination of 'likelihood of confusion' to have collateral estoppel effect in a trademark infringement action, the [Board] or the Federal Circuit must have taken into account, in a meaningful way, the *context* of the marketplace." *Levy,* 104 F.3d at 42 (emphasis in original).

Here, the Board made detailed and specific findings in determining that defendant's mark, "when considered in its entirety, is sufficiently similar to [plaintiff's] family of TRES-prefix marks in terms of sound and overall commercial impression that, when applied to identical, relatively

---

*McCarthy on Trademarks and Unfair Competition,* §§ 32:97–99 (4th ed.2001).

**10.** Previously, the Seventh Circuit had determined that a decision of the C.C.P.A. was not entitled to collateral estoppel effect in a subsequent trademark infringement lawsuit. *Syncromatic Corp. v. Eureka Williams Corp.,* 174 F.2d 649, 650 (7th Cir.), *cert. denied,* 338 U.S. 829, 70 S.Ct. 79, 94 L.Ed. 504 (1949); *John Morrell & Co. v. Doyle,* 97 F.2d 232, 235

(7th Cir.), *cert. denied,* 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 415 (1938). However, those decisions were made when "the [C.C.P.A.] was merely an administrative arm of the Patent Office." *Flavor Corp. of America,* 493 F.2d at 280–81. In 1958, Congress made the C.C.P.A. an Article III court, *Brenner v. Manson,* 383 U.S. 519, 526, 86 S.Ct. 1033, 1037, 16 L.Ed.2d 69 (1966), effectively abrogating the rationale of those decisions. *Flavor Corp. of America,* 493 F.2d at 280–81.

inexpensive hair care products, confusion is likely to occur in the market place." *Alberto–Culver Co.*, 1999 WL 1004627 at *4. Specifically, the Board made the following findings:

1. Alberto–Culver "is engaged in the manufacture and sale of a wide variety of health and beauty aids, including hair care products." *Id.*, 1999 WL 1004627 at *1.

2. Alberto–Culver "markets a range of hair care products under its mark TRESEMME." *Id.*

3. "Through the years, [Alberto–Culver] has expanded its product line and, in connection therewith, has used several other TRES-prefix marks." *Id.*

4. Alberto–Culver's "products are sold by distributors to retail outlets for direct sales to consumers and to beauty salons for use in the salons and resale to salon customers." *Id.*

5. Alberto–Culver's "products have been promoted through advertisements in publications such as Vogue, Elle, People and Modern Salon, and through commercials on television and radio." *Id.*

6. Alberto–Culver "also promotes its products at trade shows." *Id.*

7. "Since 1997, sales of [Alberto–Culver's] products under its TRES-prefix marks have exceed $450 million[, and a]dvertising expenditures, since 1984, have totaled more than $20 million." *Id.*

8. Trevive, Inc.'s "hair care products are sold primarily to hair salons for resale to customers." *Id.*

9. Trevive, Inc.'s "products have been promoted through trade shows, and in advertisements in trade publications, including Modern Salon and American Salon." *Id.*

10. As shown by Alberto–Culver's "ownership of . . . valid and subsisting registrations for its marks," Alberto–Culver established priority of use for: "TRE-SEMME for hairspray, permanent wave, hair conditioners, hair thickeners, wig sprays, creme lotion developer, wig cleaners and hair shampoos; TRESPAC for protein hair conditioning treatments; TRESSPRAY for hair styling spray and sculpting spritz; TRESGELEE (stylized) for hair styling gel; TRESWAVE for hair permanent wave preparation; TRESSHINE for hair conditioning mist for treating frizzy hair; and TRESHOLD (stylized) for hair spray." *Id.* at *2.

11. "The applied for goods of [Trevive, Inc.] and [Alberto–Culver's] goods are related for purposes of determining whether a likelihood of confusion exists." *Id.*

12. "[B]oth parties' marks are used in connection with identical hair care products, namely hair shampoo, hair conditioner, hair gel and hair spray." *Id.*

13. "The goods . . . move through the same channels of trade to the same classes of purchasers." *Id.*

14. Both parties' "hair care products appear to be relatively inexpensive and they likely would be purchased on impulse." *Id.*

15. Alberto–Culver "has created a family of TRES-prefix marks." *Id.*

16. The phrase "Nutrients for the Life of Your Hair" in Trevive's mark is "suggestive and appears in much smaller type than does the TREVIVE portion." *Id.*

17. "The dominant TREVIVE portion of [Trevive, Inc.'s] mark sounds similar to the members of [Alberto–Culver's] TRES-prefix family of marks." *Id.* at *3.

18. "[T]he term 'Tre Vive' will be perceived as a French word or phrase meaning very lively or very alive, and pronounced TRAY-VIVE. TRE would be understood or heard as phonetically equivalent to the French adverb TRES, mean-

ing very; VIVE is an adjective meaning lively." *Id.*

19. "TRESemme and the other terms beginning with TRES also are French in sound and appearance and would be perceived as French or French-derived terms.... TRES ... is usually without an accent when written in capital letters. The use of an accent over the final 'e' in Tresemme gives the term a French appearance. 'Gelee' and 'mousse' are French words and would be perceived as such.[¶] Since the 's' in tres is silent, TRES and TRE are phonetically equivalent. TRES is pronounced as TRAY." *Id.*

20. Alberto–Culver's "marks and the TREVIVE portion of [Trevive, Inc.'s] mark sound like and look like French terms or French-derived terms." *Id.*

21. "[A]lthough [Alberto–Culver's] first mark TRESEMME was derived from the term 'tress' (a tress of hair) and the surname (Emme) of an employee ..., [Alberto–Culver's] later marks 'exploit the popularity of European hair styling products by employing the formative TRES meaning "very" in French, and using that formative to create French sounding marks....'" *Id.*

22. Alberto–Culver "has used, on at least one occasion, various TRES-slogans to promote its products." *Id.*

23. Alberto–Culver "sells its products in black containers with the word 'European' on labels so as to enhance the 'European' image of [its] products." *Id.*

24. Trevive, Inc.'s national sales director described Trevive as having "almost a continental French flair to it...." *Id.*

25. Nothing in the record supports a finding that Trevive, Inc., selected its mark out of " 'a desire to exploit the good will associated with [Alberto–Culver's] TRES-family of marks.' " *Id.*

In its opinion affirming the Board's conclusion, the Federal Circuit made additional findings:

26. "In 1959, Alberto–Culver and its predecessors acquired the rights to use the mark TRESEMME for hair spray, permanent wave, hair conditioners, hair thickeners, wig sprays, creme lotion developers, wig cleaners, and hair shampoos. The TRESEMME mark has enjoyed continuous use since that time." *Han Beauty, Inc.*, 236 F.3d at 1334.

27. "From the early 1960's until about 1980, Alberto–Culver used several other marks with the TRES-prefix, namely TRESNET for hairspray, TRESLAK for laquer, and TRESOXIDE for peroxide." *Id.* at 1335.

28. "In the mid–1970's, Alberto–Culver began marketing the mark TRESPAC for protein hair conditioning treatments and has continued use of that mark to the present." *Id.*

29. "From 1984 to 1986, Alberto–Culver introduced products bearing the following marks: TRESGELEE for hair styling gel; TRESSPRAY for hair styling and sculpting spritz, TRESWAVE for hair permanent wave preparations; TRESMEND for hair conditioner; and TRESGLAZE for hair styling and sculpting liquid. These marks appeared with the word 'European' on the labels of black containers." *Id.*

30. "In the late 1980's and early 1990's, Alberto–Culver introduced TRESLIFT for hair volumizer, TRESHOLD for hair spray, and TRESSHINE for hair conditioning mist for treating frizzy hair." *Id.*

31. "Alberto–Culver owns trademark registrations for TRESEMME, TRESPAC, TRESSPRAY, TRESGELEE, TRESWAVE, and TRESHOLD." *Id.*

32. "Alberto–Culver sells the TRES-products as part of a TRESEMME prod-

uct line with the TRESEMME mark appearing on the packaging of all products in the line." *Id.*

33. "From 1984 to 1996, Alberto–Culver expended over $20 million in advertising its TRES-prefix marks, promoting the TRES-product line through advertisements in publications and through television and radio commercials." *Id.*

34. Alberto–Culver "sells its products through distributors to retail outlets for direct sales to consumers, and to beauty salons for use in the salons and for resale to salon customers." *Id.*

35. "From 1977 to 1996, Alberto–Culver sold over $450 million in hair care products under its TRES-prefix marks." *Id.*

36. Trevive and its predecessor "began selling hair care products bearing the TREVIVE mark through its salons in February of 1994." *Id.*

37. Trevive and its predecessor "also ha[ve] sold other hair care products in [their] salons, including many of Alberto–Culver's TRES-products described above and hair care products from other suppliers." *Id.*

38. "The record contains no evidence of actual confusion." *Id.*

Any fair reading of the Board and Federal Circuit opinions demonstrates that both the Board and Federal Circuit meaningfully considered the entire marketplace context in determining the likelihood of confusion issue.[11] Specifically, in refusing to register defendant's mark, the Board and the Federal Circuit considered the identical nature of the parties' products (Findings nos. 1, 10–12, 14), the channels through which the products were advertised and sold (Findings nos. 4–6, 8–9, 13, 22, 33–35, 37), Alberto–Culver's advertising expenditures and sales (Findings nos. 7, 33–37), the sound and appearance of the marks in question (Findings nos. 2–3, 15–22, 24, 32), and the packaging of Alberto–Culver's products (Findings nos. 23, 32). In similar circumstances, the Seventh Circuit has applied collateral estoppel, *see EZ Loader Boat Trailers, Inc.,* 746 F.2d at 379 (applying collateral estoppel to Federal Circuit decision affirming Board's denial of opposition to registration when Board "examined not only the marks in isolation, but also the manner in which they were affixed to the trailers, their use in sales and advertising brochures, and the channels through which the products were marketed"), and it is appropriate here.

Indeed, collateral estoppel is particularly appropriate here because the Board and Federal Circuit considered seven of the eight Sleekcraft factors set forth by the Ninth Circuit for consideration in trademark infringement cases:[12] the similarity of the conflicting designations (Findings nos. 16–24); the relatedness or proximity of the two companies' products or services (Findings nos. 1–3, 11–14, 36–37); the strength of plaintiff's mark (Findings nos. 7, 10, 15, 26–33, 35); the marketing channels used (Findings nos. 4–6, 8–9, 13, 34); the degree of care likely to be exercised by purchasers in selecting goods (Finding no. 14); the defendant's intent in selecting its mark (Finding no. 25); and the evi-

---

11. Here, the entire marketplace includes retail outlets for direct sales to consumers, beauty salons for use in the salons and resale to salon customers, trade shows, and advertisements in publications, trade publications and on the television and the radio. *See* Findings nos. 4–6, 8–9, 13, 33–34, 37.

12. The Court recognizes, as discussed in Part IV above, that the eight-factor Sleekcraft test is not mechanical and that other factors may sometimes be quite important in determining trademark infringement, *Brookfield,* 174 F.3d at 1054; however, the parties in this matter have not identified any other factors applicable here.

dence of actual confusion (Finding no. 38).[13] Since the Board and Federal Circuit considered the Sleekcraft factors in assessing likelihood of confusion, the Court rejects defendant's argument that likelihood of confusion was not actually litigated in the opposition proceeding. Moreover, an examination of the Sleekcraft factors shows the plaintiff's TRES-family of marks is very strong, both historically and based on the amount of sales annually, the parties sell similar and identical products through the same channels to the same class of purchasers, the purchase of the parties' products tends to be impulsive due to the low cost of the products, and, most importantly, the trade names sound similar, as if they were French words.

Finally, applying collateral estoppel in the present circumstances advances the purposes of the collateral estoppel doctrine. Defendant Trevive, Inc., had a full and fair opportunity to litigate the issue of likelihood of confusion before the Board. The parties presented documentary evidence and stipulated trial testimony, filed legal briefs, and had oral argument before the Board. *Alberto–Culver,* 1999 WL 1004627 at *1. Faced with an adverse decision by the Board, defendant had the option of either appealing the Board's decision to the Federal Circuit or obtaining a de novo hearing before a United States district court. 15 U.S.C. § 1071. Defendant chose to appeal to the Federal Circuit, thereby waiving its right to de novo review before a United States district court. 15 U.S.C. § 1071(b). "The fact that [defendant] chose the forum in which

to proceed weighs in favor of [the] collateral application of the forum's findings, and of discounting [defendant's] complaints of procedural inadequacies." *EZ Loader Boat Trailers, Inc.,* 746 F.2d at 377 (citation omitted).

For all these reasons, the Court finds that the Board and Federal Circuit meaningfully considered plaintiff's and defendant's marks in their entire marketplace context, the issues are the same, and collateral estoppel is appropriate. *Levy,* 104 F.3d at 42.

## VI

■ The defendant has presented evidence that after the Federal Circuit's decision it repackaged its product and changed the manner in which its TREVIVE mark is presented on the packaging.[14] *See* Defendant's Appendix of Exhibits, Exhs. H and K; Han Decl., ¶ 7. Of significance, the repackaged product eliminates the large stylized V seen on the earlier packaging, which had the effect of breaking TREVIVE into two separate words, and which was a crucial factor in the Board's and Federal Circuit's determinations that the TREVIVE mark sounds like, and looks like, a French term. *Han Beauty, Inc.,* 236 F.3d at 1337; *Alberto Culver,* 1999 WL 1004627 at *2–3. Indeed, as Professor Peter V. Conroy declared, "[b]ased on its construction and appearance, I believe the term 'TreVive' will be perceived as a French word or phrase meaning very lively or alive, and pronounced TRAY–VIVE." Declaration of Peter V. Conroy, ¶ 6 (Ferguson Decl., Exh. 1 at 226–27). However,

---

**13.** Neither party suggests that the eighth factor, the likelihood of expansion in product lines, which neither the Board nor the Federal Circuit considered, is relevant here since both parties already use their marks in connection with similar hair care products. *See Brookfield,* 174 F.3d at 1060 ("The likelihood of expansion in product lines factor is rela-

tively unimportant where two companies already compete to a significant extent."); *GoTo.Com, Inc.,* 202 F.3d at 1209 (same).

**14.** Nevertheless, there is some evidence that the defendant still utilizes the old version of its TREVIVE mark, as well. *See* Declaration of Mike Yaghmai, Exh. 2.

the defendant's new packaging presents the TREVIVE mark as one word in block letters, rather than two separate words. Han Decl., ¶ 7, Defendant's Appendix of Exhibits, Exh. H.

The most troublesome aspect of this is case is whether collateral estoppel applies to defendant's repackaged product. Here, the packaging or visual presentation of the Trevive mark has dramatically changed since the Board's and Federal Circuit's decisions; however, the similar nature of the products and the pronunciation of the mark remain the same. *See* Goodstein Decl., ¶¶ 33–35. Is the repackaging a material change in the facts that affects the application of collateral estoppel? *See Montana,* 440 U.S. at 159, 99 S.Ct. at 976 ("[C]hanges in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues."); *Levi Strauss & Co.,* 778 F.2d at 1357 ("If different facts are in issue in a second case from those that were litigated in the first case, then the parties are not collaterally estopped from litigation in the second case."); 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 32:98 (4th ed. 2001) ("Under familiar principles of collateral estoppel, if the facts have changed since the previous adjudication, there will be no estoppel, for then the facts of the two cases are different."). In an analogous situation, the Second Circuit has concluded that collateral estoppel does not apply. *See Jim Beam Brands Co.,* 937 F.2d at 734–36 (holding consideration of actual mark rather than different, typewritten version of mark was material change rendering collateral estoppel inappropriate). Since neither the Board nor the Federal Circuit considered Trevive's new packaging, the Court applies the collateral estoppel doctrine solely to the TREVIVE mark on the packaging considered by the Board and Federal Circuit.

## VII

■ In general, "[t]he requirements for the issuance of a permanent injunction are the likelihood of substantial and immediate irreparable injury and the inadequacy of remedy at law." *Easyriders Freedom F.I.G.H.T. v. Hannigan,* 92 F.3d 1486, 1495 (9th Cir.1996) (citations and internal quotation marks omitted); *Walters v. Reno,* 145 F.3d 1032, 1048 (9th Cir.1998), *cert. denied,* 526 U.S. 1003, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999). However, injunctive relief should be "no broader than necessary to provide complete relief" to the aggrieved party. *Easyriders Freedom F.I.G.H.T.,* 92 F.3d at 1496.

This Court is "vest[ed] ... with the 'power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right' of the trademark owner." *Levi Strauss & Co. v. Shilon,* 121 F.3d 1309, 1314 (9th Cir.1997) (quoting 15 U.S.C. § 1116(a)). In weighing the equities in trademark cases, this Court should consider the legitimate interests of the parties, as well as the consuming public. *AMF Inc.,* 599 F.2d at 355.

"In trademark cases, once the plaintiff establishes a likelihood of confusion between the plaintiff's mark and the defendant's, it is ordinarily presumed the plaintiff will suffer irreparable harm if injunctive relief is not granted." *International Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 827 (9th Cir.1993); *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 612 n. 3 (9th Cir.1989). Moreover, "[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1180 (9th Cir.1988).

Here, plaintiff seeks a permanent injunction enjoining defendant from "using

the trademark or trade name TREVIVE ... or any other trade name, trademark or other form of trade identity composed, in whole or in part, of the term 'Trevive,' " "using any other trade name, trademark or other form of trade identity composed, in whole or in part, of the term 'Tres,' or which is [a] colorable imitation of[,] ... [or] confusingly similar to[,] [plaintiff's] TRES-marks or TRES-family of marks[,]" or "doing any act or thing likely to induce the belief that Trevive's business or products are in any way connected with [plaintiff's] business." Proposed Summary Judgment Order and Permanent Injunction at 6:24–7:9; *see also* Plaintiff's Memorandum of Points and Authorities in Support of Summary Judgment Motion at 18:5–20 (requesting "this Court to enter the form of permanent injunction filed concurrently herewith"). However, plaintiff's requested injunctive relief is too broad. As set forth above, the issue actually litigated and decided by the Federal Circuit was the likelihood of confusion caused by defendant's TREVIVE mark as presented to the Board; that is, the TREVIVE mark with the large stylized V that effectively separated TREVIVE into two words, suggesting a French connotation. Thus, at this time, it is only this specific presentation of the TREVIVE mark that should be enjoined based on the Federal Circuit's finding of likelihood of confusion. *Century 21 Real Estate Corp.*, 846 F.2d at 1180–81.

### ORDER

For the foregoing reasons, IT IS ORDERED that plaintiff's motion for partial summary judgment on the basis of collateral estoppel is GRANTED, in part, as to the first, second and fifth causes of action, as discussed above.